## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

NICE Systems, Inc.,                              Civil No. 16-1759 (DWF/DTS)

        Plaintiff,

v.                                                       **MEMORANDUM OPINION AND ORDER**

Pedro J. Becquer,

        Defendants.

_____

Cicely R Miltich, Esq., and Randall E. Kahnke, Esq., Faegre Baker Daniels LLP; Jay P. Warren, Esq., Megan Awerdick Pierson, Esq, and Sarah W. Bloom, Esq., Bryan Cave LLP counsel for Plaintiff.

Andrew M. Irlbeck, Esq., Andrew Irlbeck, Lawyer, Chartered; Jeffrey S. Storms, Esq., Newmark Storms Law Office, counsel for Defendants.

_____

## INTRODUCTION

This matter is before the Court on a motion for summary judgment brought by Defendant Pedro J. Becquer. (Doc. No. 44.) For the reasons set forth below, the Court denies the motion.

## BACKGROUND

Plaintiff NICE Systems, Inc. ("NICE") licenses software and sells related services worldwide. (Doc. No. 85 ("Wojcik Decl.") ¶ 4.) Becquer worked for NICE from September 10, 2012, through January 15, 2016. As part of his employment, Becquer signed an offer letter on September 5, 2012 (the "Contract"). (Doc. No. 50 ("Storms

Decl.") ¶ 4, Ex. B at 4.)  The Contract provides:

> Position.  Your position will be that of Strategic Account Executive reporting to Christopher Walker.  In addition to performing duties and responsibilities associated with this position, from time to time the Company may assign you other duties and responsibilities.  *As a full-time employee of the Company, you will be expected to devote your full business time and energies to the business and affairs of the Company*.

(Contract ¶ 1 (emphasis added).)

Under the Contract, Becquer participated in NICE's commission plan (the "Plan"). NICE issues a new Plan each year.  The Plans for 2012-2015 applied to all NICE sales representatives and expressly authorized NICE to change a sales representative's territory or account assignments.  (Doc. No. 86 ("Bethoney Decl.") ¶ 8, Exs. A, B.)  Every year, sales representatives were required to sign a goal sheet to be eligible for commissions. (Bethoney Decl. ¶ 5.)  Becquer's 2013 Goal Sheet listed his title as Strategic Account Executive, his manager as Christopher Walker, and his salary as $130,000.  (*Id*. ¶ 9, Ex. C.)  In 2014, Becquer's Goal Sheet listed his title as Global Account Executive, his manger as Luis Villanueva, and his salary as $140,000.  (*Id*. ¶ 10, Ex. D.)  Becquer signed both goal sheets electronically and, by signing, certified that he read, understood, and agreed to be bound by the terms and conditions contained therein.  (*Id*.)

When Becquer began working at NICE in September 2012, he was assigned one account, UnitedHealth Group ("UHG").  (Wojcik Decl. ¶ 7; Doc. No. 65 ("Warren Decl.") ¶ 2, Ex. A, ("Wojcik Dep.") at 95, 100.)  Becquer reported to Christopher Walker, a Strategic Account Executive, who reported to Alan Wojcik, Sales Vice President for NICE.  In 2013, Becquer moved from the UHG account to the CitiGroup

2

("Citi") account. Wojcik considered the UHG and Citi accounts to be equal (one in the "healthcare vertical" and the other in the "bank vertical") and he, therefore, considered Becquer's move to the Citi account to be lateral. (Wojcik Dep. at 95.) Nonetheless, Wojcik explained that he agreed to change Becquer's title to Global Account Executive at Becquer's request. (*Id*. at 97-99.) In 2013, Becquer helped new sales representatives working on the UHG account and primarily worked on the Citi account. (Warren Decl. ¶ 3, Ex. B ("Becquer Dep.") at 40-41.) Becquer completed his switch from UGH to the Citi account as of January 1, 2014, at which time he began reporting to Villanueva, the Regional Vice President for Nice Strategic account bank clients. (Wojcik Dep. at 99-100; Warren Decl. ¶ 23, Ex. V ("Villanueva Dep.") at 26; Wojcik Decl. ¶ 8.)

Meanwhile, on July 29, 2015, and while working for NICE, Becquer entered into an employment contract with Mirantis, Inc., a separate company located in California, to work as an account executive in a full-time capacity. (Warren Decl. ¶ 5, Ex. D; Becquer Dep. at 77, 80.) Becquer worked for Mirantis from August 10, 2015, until January 11, 2016. At Mirantis, Becquer earned a base salary of $150,000 per year, plus variable compensation of $150,000 annually based on sales quotas, stock options, and other compensation. (Becquer Dep. at 80, 115-16.)

On November 10, 2015, after hearing rumors that Becquer was working for Mirantis, Wojcik met with Becquer in Minneapolis and asked Becquer directly if he was working for Mirantis. (Wojcik Dep. at 26.) Becquer told Wojcik that Mirantis had offered him a position, but that he was waiting to see what would happen in January 2016

3

with his job at NICE. (*Id.*) Wojcik testified that he repeated the question: "So I said again, are you working for Mirantis? He said no, I'm not." (Wojcik at 26-27.)

On January 6, 2016, NICE promoted Becquer to Regional Vice President, Back Office. NICE asserts that the promotion was offered in an effort to address Becquer's desire to move from direct sales into a management position. On January 12, 2016, Becquer told Laura Cooper, NICE's Vice President of Human Resources for the Americas, that he had been working for Mirantis for thirty days, and that he had recently resigned from Mirantis. (Storms Decl. ¶ 19, Ex. Q.) Initially, NICE allowed Becquer to continue working at NICE on the condition that Becquer confirmed his resignation with Mirantis. (*Id.*) On January 14, 2016, Wojcik told Cooper that he had spoken with a contact at Mirantis, who had informed Wojcik that Becquer had been working for Mirantis since July 29, 2015. (*Id.*) On January 15, 2016, NICE terminated Becquer's employment.

On May 31, 2016, NICE filed this lawsuit. (Doc. No. 1.) NICE asserts three causes of action: (1) breach of contract; (2) breach of duty of loyalty; and (3) fraud. Becquer moves for summary judgment on all claims.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

## II.    Choice of Law

Here, the Contract states that it is "governed by the laws of the State of New Jersey, without giving effect to the conflicts of law principles thereof." (Contract ¶ 7(c).) NICE asserts that New Jersey law, therefore, applies. Becquer does not concede that the breach of contract claim is governed by New Jersey law because the Contract was not operative when he was dually employed. Becquer nonetheless agrees that there is no need for a choice-of-law analysis because there is no conflict between New Jersey and Minnesota law.

5

Minnesota courts honor "choice of law clauses." *Fla. State Bd. of Admin. v. Law Eng. & Enviro. Servs., Inc.*, 262 F. Supp. 2d 1004, 1012 (D. Minn. 2003). There is no dispute that the Contract was valid when signed and that if NICE's breach of contract claim is viable, it is governed by the Contract. In addition, the issues relevant to the breach of contract claim arise under the Contract. The parties also agree that there is no conflict between New Jersey and Minnesota law as to the remaining claims. Therefore, the Court applies New Jersey law to the breach of contract claim, but will refer to both New Jersey and Minnesota law throughout this order.

### III. Breach of Contract

NICE brings a breach-of-contract claim against Becquer, asserting that it and Becquer were parties to the Contract and that Becquer materially breached the Contract when he engaged in dual employment, effectively working two full-time positions for different companies at the same time. NICE relies primarily on the Contract's provision that states "[a]s a full-time employee of [NICE], you will be expected to devote your full business time and energies to the business and affairs of [NICE]." (Contract ¶ 1 (referred to as the "full-time provision".) NICE further argues that Becquer's dual employment caused Becquer to fail to fully perform his duties for NICE, resulting in substantial damage to NICE.

Under the law of both New Jersey and Minnesota, the interpretation of a contract rests on the intention of the parties, which is to be gathered from the language of the contract as a whole. *See Great Atl. & Pac. Tea Co. v. Checchio*, 762 A.2d 1057, 1060-61

(N.J. Super. Ct. App. Div. 2000); *Brookfield Trade Center, Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). When a contract's meaning is ambiguous, the meaning becomes an issue of fact and summary judgment is inappropriate. *See Great Atl. & Pac. Tea Co. v. Checchio*, 762 A.2d at 1061; *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 818 F.3d 356, 361-62 (8th Cir. 2016).

As an initial matter, the parties disagree about which contract applies. NICE asserts that the Contract (signed on September 5, 2012, when Becquer was hired by NICE as a Strategic Account Executive) applies to the breach of contract claim. NICE points out that this Contract did not specify a term of expiration or definite duration and that there is no provision in the Contract that states that the terms of the Contract will terminate if Becquer changes titles. NICE also highlights the language of the Contract's termination clause, which reads: "Either you or the Company may terminate the employment relationship at any time and for any reason. In either case such termination shall be made after a notice period of fifteen (15) days (the "Notice Period")." (Contract ¶ 6.) Further, NICE points to the amendment provision in the Contract, which provides: "This offer letter may only be amended or modified in writing signed by both you and the Company." (*Id*. at 3.) NICE argues that the above constitutes compelling evidence that the parties intended that any mutually agreed modifications, including a change in position, would amend, not terminate, the Contract. NICE contends that there is no contemporaneous evidence that the parties intended to enter into a new agreement when Becquer's title changed, and, in particular, that there is no evidence that Becquer

7

informed anyone at NICE that the Contract had terminated. Instead, NICE maintains that the parties understood that the scope of Becquer's role as Global Account Executive was to be covered under his existing Contract. Finally, NICE argues that Becquer breached the Contract when he was dually employed.

Becquer, on the other hand, argues that the Contract applied to only his position as a Strategic Account Executive and that the Contract terminated when he began his role as Global Account Executive. Becquer argues that the Global Account Executive position constituted a new and distinct position that was separate from the Strategic Account Executive position. Becquer contends that he accepted the new position of Global Account Executive and that a new agreement was supported by new consideration. In addition, Becquer points out that the alleged "full-time provision" of the Contract was contained in the "position" subsection of the Contract and is thus limited to the Strategic Account Executive position and not his role as Global Account Executive. Becquer asserts, therefore, that during his period of dual employment, he was not contractually precluded from engaging in secondary employment.

Here, the Court concludes that numerous fact issues preclude summary judgment on NICE's breach-of-contract claim. In particular, the Court concludes that the Contract is ambiguous as to the intention of the parties. Fact issues on interpretation exist as to whether Becquer's change in job title from Strategic Account Executive to Global Account Executive constituted a change in his position and, if so, whether such a change in position caused the Contract to terminate. Namely, NICE has pointed to evidence in

the record that could lead a reasonable juror to conclude that Becquer's change from the UHG account to the Citi account was, in fact, a lateral move that was permitted under the Contract, and that the change in Becquer's job title to Global Account Executive was in essence form over substance and did not equal a change in position. Further, even if Becquer could establish, as a matter of law, that Becquer's change in job title constitutes a change in position, there remain fact issues as to whether such a change would effectively terminate the Contract. On these issues, the Contract is ambiguous and on its face does not reveal the intention of the contracting parties. Because these issues of fact cannot be resolved on summary judgment, they are appropriately left for the jury. Therefore, the Court denies Becquer's motion for summary judgment on NICE's breach of contract claim.

## IV. Breach of Duty of Loyalty

NICE also asserts that Becquer breached his duty of loyalty. Specifically, NICE bases this claim on evidence that: Becquer devoted extensive business time to working for another company despite his obligation to devote his full business time to NICE; Becquer failed to disclose his employment with Mirantis for five months; and Becquer lied to Wojcik about his dual employment. Becquer moves for summary judgment on this claim, arguing that under Minnesota and New Jersey law, NICE cannot demonstrate that a non-officer, non-managerial employee breaches a duty of loyalty to his employer

9

when he works a second job for a non-competitor[1]. In his reply, Becquer also raised the argument that he is entitled to summary judgment on his breach-of-duty-of-loyalty and fraud claims because they are barred by New Jersey's economic-loss doctrine and independent duty principles under New Jersey and Minnesota law.

Under Minnesota law, employees owe a duty of loyalty to their employers. *See Marn v. Fairview Pharmacy Servs.*, *LLC*, 756 N.W.2d 117, 121 (Minn. Ct. App. 2008); *see also Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987) (stating that the employee's duty of loyalty prohibits an employee from competing with the employer while still employed). Similarly, under New Jersey law, employees owe their employers a duty of loyalty. *See Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1168 (N.J. 2001) ("Loyalty from an employee to an employer consists of certain very basic and common sense obligations. An employee must not while employed act contrary to the employer's interest.") (citation omitted). The Supreme Court of New Jersey has cautioned against the mechanical application of the duty of loyalty, given that the contexts giving rise to such claims are so varied, and explained that "the adjudication of such claims summons rules of reason and fairness." *Cameco, Inc. v. Gedicke*, 724 A.2d 783, 788-89 (N.J. 1999). The New Jersey Supreme Court identified four factors for a court breach of duty of loyalty claims. These factors are: (1) the existence of contractual provisions (either permitting a second source of income or limiting such employment); (2) whether the employer knew of or agreed to secondary

---

[1] Plaintiff does not argue that Mirantis is a competitor.

10

"profit-seeking activities"; (3) the status of the employee and relationship to his employer (i.e., an officer or director as opposed to a non-officer employee); and (4) the nature of the employee's secondary source of income and its effect on the employer. (*Id*. at 791.)

Considering the factors outlined above, the Court necessarily concludes that fact issues preclude summary judgment in Becquer's favor on this claim. First, aside from the issue of whether the Contract applies here, the jury will consider evidence that the parties expected that Becquer would devote his full business time to NICE. Second, NICE points to record evidence that NICE did not know about or agree to Becquer's dual employment and, in fact, that Becquer misled NICE about his employment. Third, while Becquer was not an officer or director for NICE during his period of dual employment, it cannot be said that he was a low-level employee and, in any event, there are factual issues as to what "level" position Becquer held at NICE. Fourth, there are factual issues as to whether and to what extent Becquer's dual employment with Mirantis harmed NICE. Viewing the evidence in the light most favorable to NICE, a reasonable juror could conclude that Becquer breached a duty of loyalty to Becquer.

The Court has also considered Becquer's late-coming argument that NICE's breach-of-duty-of-loyalty claim flows from and is intertwined with NICE's breach-of-contract claim so as to bar the former. Generally under both New Jersey and Minnesota law, tort claims cannot arise from a contractual relationship. *See St. Jude Med., S.C. v. Biosense Webster, Inc.*, 994 F. Supp. 2d 1033, 1051-52 (D. Minn. 2014) (dismissing a duty-of-loyalty claim that is redundant to, and seeks the same damages as,

11

its breach-of-contract claim); *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 676-77 (D.N.J. 2009) (explaining that the economic-loss doctrine bars common-law-fraud and duty-of-loyalty claims that are not separate and distinct from breach-of-contract claims). The Court finds that it is premature to determine whether the nature of NICE's duty-of-loyalty claim is so intertwined with the breach-of-contract claim so as to require the former's dismissal. NICE's breach-of-duty-of-loyalty claim appears to be broader than the breach-of-contract claim, and NICE contends that it permissibly offers the Contract as evidence that Becquer breached his distinct duty of loyalty. *See Lamorte Burns & Co.*, 770 A.2d at 1160-61, 69-70 (affirming summary judgment against an employee for both breach of duty of loyalty and breach of contract; considering contractual obligations as material evidence to the breach of loyalty claim). In addition, it is worth noting that Becquer seeks to dismiss NICE's contract claim because he contends that the Contract terminated before Becquer began working for Mirantis. Therefore, the applicability of the Contract is in dispute, making it inappropriate to apply the economic loss doctrine. *See, e.g.*, *Shapiro v. Barnea*, Civ. No. 06-811, 2006 WL 3780647, at *4 (D.N.J. Dec. 21, 2006) (declining to apply the economic-loss doctrine to bar a fraud claim when the validity of the contract—and thus the entitlement to contract remedies—is in dispute). Should, after trial, the jury determine that the Contract was operative when Becquer was dually employed and that the evidence demonstrates that the breach-of-contract and common-law claims are so intertwined or seek recovery of the same damages, the Court will revisit the issue. For

now and for the reasons discussed above, the Court denies Becquer's motion on the breach of duty of loyalty.

## V. Fraud

NICE also asserts a claim for fraud, arguing that Becquer committed fraud when he lied to Wojcik on November 10, 2015, about his dual employment with Mirantis, answering "no" when asked directly if he was working with Mirantis. Becquer argues that he is entitled to summary judgment on this claim because any reliance on his statement on the part of NICE was unreasonable and because NICE's alleged damages are speculative. Becquer contends that, even accepting the allegation that he was asked about and denied working for Mirantis, NICE had ample information, opportunity, and resources to independently investigate Becquer's employment status with Mirantis. In addition, Becquer argues that NICE's alleged fraud damages are based solely on wages and commissions that NICE contends it would not have paid Becquer had he disclosed his dual employment, but maintains that the assertion that he would have been fired if he had revealed his dual-employment status is speculative. Finally, Becquer argues that NICE cannot demonstrate that it suffered any damages as a result of the alleged fraud.

Under New Jersey law, the elements of a fraud claim are: (1) a material representation of a presently existing fact or past fact; (2) knowledge or belief in the falsity of the representation; (3) an intention that the other party rely on the representation; (4) reasonable reliance; and (5) resulting damages. *Adesanya v. Novartis Pharms. Corp.*, Civ. No. 13-5564, 2016 WL 4401522, at \*9 (D.N.J. August 15, 2016);

13

*Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (N.J. 2005). Similarly, to establish a claim for fraud under Minnesota law, a plaintiff must demonstrate that: (1) the defendant made a false representation about a past or present material fact that was susceptible of knowledge; (2) the defendant knew the representation was false or asserted it as their own knowledge without knowing whether it was true or false; (3) the defendant intended to induce the plaintiff to act; (4) the plaintiff acted in reliance on the representation; and (5) the plaintiff was damaged. *U.S. Bank v. Cold Spring Granite Co.,* 802 N.W.2d 363, 373 (Minn. 2011); *see also Valspar Refinish, Inc. v. Gaylord's, Inc.,* 764 N.W.2d 359, 369 (Minn. 2009) (providing that "[r]eliance in fraud cases is generally evaluated in the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue").

For purposes of this motion, the first three elements are not at issue. As to the final two elements, reasonable reliance and damages, the Court finds that issues of fact remain.[2] First, the reasonableness of NICE's reliance is a question for the jury. Second, NICE has pointed to record evidence that had Becquer been honest about his dual employment with Mirantis, NICE would likely have terminated Becquer's employment. (Warren Decl. ¶ 15 ("Cooper Dep.") at 129-130; Wojcik Dep. at 29.) Viewing this evidence in the light most favorable to NICE, a reasonable fact-finder could conclude that Becquer would have been terminated earlier had NICE known that Becquer was dually

---

[2] The Court notes that Becquer has not cited to any persuasive authority to support his contention that NICE had any duty to independently investigate the veracity of Becquer's denial.

employed.  In addition, material issues of fact exist as to whether NICE incurred damages, and in what amount, as a result of the alleged fraud.  Accordingly, the Court denies Becquer's motion for summary judgment on NICE's fraud claim.

Becquer also argues that NICE does not have an independent claim for fraud as it is intertwined with the breach-of-contract claim.  The Court disagrees.  NICE's fraud claim does not arise from, or depend on, the breach-of-contract claim.  Instead, NICE's fraud claim focuses on the allegations that Becquer lied to NICE about his dual employment and that the lie fraudulently induced NICE to continue to employ Becquer, rather than terminate him for cause.

## CONCLUSION

While this case survives Becquer's motion for summary judgment, the Court cautions the parties not to equate a victory at this stage of the litigation as a guarantee of victory at trial.  The Court believes that settlement would serve the interests of all parties in this particular case.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Becquer's Motion for Summary Judgment (Doc. No. [44]) is **DENIED**.

Dated:  November 22, 2017            s/Donovan W. Frank
                                     DONOVAN W. FRANK
                                     United States District Judge